Cross-appeal case numbers 16-1321 and 16-1380, Rose Coulter-Owens v. Time Inc. Oral argument not to exceed 15 minutes per side. Roger Perlstadt for the appellant. You may proceed. Good morning, Your Honors. May it please the Court. My name is Roger Perlstadt, and I represent Ms. Rose Coulter-Owens and a certified class of Michigan Magazine subscribers. I'd like to reserve three minutes of my time for rebuttal. There are two disclosures at issue here, disclosures to Axiom and disclosures to Weiland. And both of these disclosures violate the PPPA, but I'd like to focus today on the disclosures to Axiom. Time first argues that it's free to disclose Ms. Coulter-Owens and the class members' private reading information to Axiom because Time didn't sell the magazines to them at retail, as required by the statute. And it argues that it wasn't the retailer because it didn't interact with the class members and that it just delivered magazines that subscribers bought from Time's third-party sales agents. Now, Time's argument that it's not a retailer because it didn't interact with subscribers during the sale is wrong for two reasons. First, it's inconsistent with the Michigan Supreme Court's opinion in World Book. In that case, customers had ordered encyclopedias from door-to-door salespeople in Michigan, but the sale in retail was held to have occurred in Illinois, where the publisher took place. Because in that case, didn't the encyclopedia company have the right to refuse or not refuse the selling of the encyclopedia? The encyclopedia company had to authorize the sales by the salespeople. Did they have to in this case? They certainly did. The third-party sales agents. I asked if they did. I said, did they have to? Yes, I think they had to. That's in the record? Yes. There's an example contract between Time and a third-party sales agent, Magazines.com. That's in the record at 144-7. That's an agreement between a third-party sales agent, their Magazines.com, and Time. Those agreements say things like, you can sell magazine subscriptions as authorized by Time. It's explicitly authorized. That's different than saying each individual sale we have to approve. Not each individual sale, but it controls the rates. It gets to say who its agent can be. That's true. I think there's a distinction between the encyclopedia in this particular case. That is, on each individual sale, the encyclopedia owner had a right to say yea or nay. I'm not sure. The facts in the World Book case, there's not a lot of detail in the World Book case. But I think the bigger point here is that I think you're right to ask the question about control over the agents. I think what Judge Steeve did is he talked about middlemen, and we sort of adopted that language. But the real question here, I think the best way to look at this is through a lens of agency. Were the third-party sales agents acting under the control of Time, acting under the direction of Time, acting for the benefit of Time? The reason I cite the World Book case, despite perhaps some small factual differences, is just to counter the argument that Time is making that any time you use a third-party sales agent, like a door-to-door salesman, like Magazines.com, they're saying, there's no way we can be the retailer. I just think that's inconsistent with the World Book. But you're right to look deeply at the facts and the facts of what's going on. And that's actually where we think the district court erred. We think that there's a real factual dispute here as to what level of control Time has over these sales agents. And that's a factual dispute that we think the district court could not properly resolve on summary judgment. And the fact dispute is, as I said, looking through the lens of agency or through the lens of middlemen, whatever you want to call it, whether these sales agents were really acting for Time. As we say, our position, our factual position is Time authorized these sales, controlled the sales, and these were agents just selling for Time. And their position is, no, these agents were just out there selling magazines, and they told us what to deliver. The distinction, is there not, between authorizing the sales and authorizing the agent to make the sale? I'm not sure there's a relevant distinction there. The question is... Well, it's sort of like an automobile dealer. You know, he's authorized to sell cars, but it doesn't necessarily mean that Ford Motor Company has to approve each sale. No, but my understanding, and I'm not an expert in auto dealers, but my understanding is that dealers take titles to the car, that the dealers are reselling the cars. They take titles to the car. It's not like dealers take orders for cars and then send those orders to Time and say, Oh, Ms. Coulter-Owens just ordered a new car. Why don't you send her a car? And then the sale would still be from, in that hypothetical, from the car dealer to Ms. Coulter-Owens. And that's what's going on here. And so the evidence supporting our view that Time is just... I'm sorry, that the sales agents are just selling for Time are things like the Magazines.com agreement that sets out that time can dictate how much magazines are sold, when they're sold, how much they're sold for. Time can even control which particular representatives, personnel, the sales agents use to sell these magazines. There's further evidence in the Braininger deposition. Scott Braininger, their Executive Vice President of Marketing, said these sales agents sell magazines for time and that they're not buying and reselling subscriptions like I think a car dealer would. And one more piece of evidence, and I think this actually really gets to the heart of the purpose of the statute, is the fact that the transfer of customer information from customer to sales agent and then from sales agent to Time is automated. It goes through FTP protocols. Mr. Braininger testified about the automated process that that goes through. And I think that gets to the heart of the purpose of the statute, because the statute is about protecting information. And so in a typical wholesale agreement, that wouldn't be a resale agreement, Ford can say, sure, dealer, you can sell this car, and the dealer sells a car. Ford may never know who that car gets sold to. And so Ford would never have that information. But here, Time automatically gets the information. They know Ms. Coulter-Owens bought Time Magazine, bought Fortune, bought Real Simple. And that's the information that this statute is designed to protect. And Time violates that statute by disclosing that information to Axiom, a data miner that appends information to Time's mailing list so that it can, so Time gives it to Axiom so that Axiom can say, well, Ms. Rose Coulter-Owens is white. She's this age. She has this income. She has this many kids at home. She has this pet. She buys these other kinds of products, because that information is very valuable. And so, again, just- Help us explain why a technical method of storing data would have the result, would impact the case the way you're saying. Okay. If I'm understanding, I think you're talking about the transfers to Axiom now, right? Because- No, I'm actually talking about the magazine.com, because I understand Axiom is kind of your second-level alternative argument. And the question here is, who is the retailer? Yes. Magazine.com or Time. And so that's where the question is whether this is more like the encyclopedia or whether the agreement between Time and magazine.com enabling the sale creates a dispute of material fact as to who the retailer is. Right. I think- Is that- Were you talking about the provision of information to Axiom only, or isn't there some data that is maintained and exchanged between magazine.com and Time that might indicate who is the retailer? My only point with the information transfer from the sales agents to Time is simply that the information- Rose Coulter Owens bought or wants you to sell her a certain magazine. That's the only information I'm talking about. So there's that information. I think the argument you're talking about with respect to- Is the Axiom. Is Axiom stuff. So the at retail point, that was the issue that Judge Stee decided. He said that they're not at retail. And as I've said, we think that that's a factual dispute, and that depends on the factual question, basically an agency question. Were the sales agents acting under the direction and control for Time, selling magazines for Time, or were they selling them on their own with Time just delivering? So that's the at retail point. The second alternative argument with respect to Axiom is they say Axiom is their agent. And they say Axiom just houses our information debt. They just kind of do our database storage. But that's not entirely true. Axiom does several things for Time. It does do some things like that. It also- Granted, and I understand that distinction because of that contractual relationship. I'm just trying to get the particular factual distinctions on the at retail issue. Sure. And do you agree that Kinder v. Meredith Corp., the Eastern District of Michigan case, correctly explains what the statute means by being a retailer? I don't think we can rely on the Kinder. If I'm recalling Kinder correctly, that was a motion to dismiss. And I think the court-the third-party sales agents weren't an issue. I think the judge just kind of made an offhanded dicta comment that if they were buying from someone else, it wouldn't. So it wasn't in this- The distinction being whether who's retail at this particular event versus who is a retailer. I mean, there's no question Time is a retailer. Sure. But for the statutory issue that's before us, it has to be who was the retailer in this particular circumstance. Right. That's your understanding of the requirement of proof. There's no dispute that Ms. Coulter Owens bought magazines at retail, that she bought them for her personal use. And so the question is, who sold them to her? In that relationship. Well, yes. But the point is, who does she have the relationship with? Does she have the relationship? I understand that. I'm just trying to see if there's a more global issue about the requirement to be a retailer. Because we know Time is a retailer. But the question is, are they a retailer in this circumstance with magazine.com? And then we get into the particular factual things that you correctly pointed out. One, the agreement between them giving Time the right to avail itself of choosing representatives or overseeing representatives versus the fact that magazine.com or these sellers deal with the buyers if there's a question that comes to Time, Time sends it back to magazine.com. Right. Give me your quick balance on why you think it rises to the level of a dispute of material fact. The point is, the question is, when you buy from, our position is when you buy from a sales agent, an agent of Time, you are buying from Time. You are interacting with Time. And our evidence is, I think probably our strongest evidence is the Braininger testimony. He says, the sales agents sell magazines for Time. And then the agreements and the automatic file transfers. But I think if we're permitted to put Mr. Braininger on the stand and explain how this stuff works, who's selling for whom, who's controlled by whom, why sales agents are selling these magazines, whether they can just sell magazines willy-nilly and all they do is tell Time to deliver them, or whether Time's controlling them. I think if we're allowed to get Braininger on the stand, present him with these documents, and talk to him, and put all of this in front of a jury, that's a jury question. And I think that's a real question that the jury can answer. And I see my time is up for now. I'd like to reserve the remainder. Thank you. Thank you, Erin. May it please the Court. Jeff Landis on behalf of Time. And I want to start with the same issue Mr. Perlstadt started with, which is the at-retail issue. And I want to be clear. There's no factual dispute with respect to that issue. There's a disagreement about the legal significance of undisputed facts. And in this case, Judge Stee recognized that the distinctions or the facts that Ms. Calderon points to are a distinction without a difference with respect to whether or not Time was the retailer in this case. And I think an example illustrates why. Imagine I go to my local hardware store to buy a lawnmower. And the hardware store has Craftsman lawnmowers in stock, but they're out of Toro lawnmowers. But the salesperson tells me, hey, I can contact Toro and have them send you a Toro lawnmower from the warehouse directly to your house. In that case, is the hardware store the retailer if I buy the Craftsman lawnmower but not the Toro lawnmower? Of course not. The hardware store is the retailer in both situations. In both situations, I pay the hardware store. In both situations, if I have an issue with my lawnmower, I contact the hardware store. And if I go with the Toro lawnmower and it doesn't show up on my doorstep five days later, I call the hardware store, not Toro. And the same is the case here. I think you're getting to it because it boils down to what are the facts here in this relationship? So what is the strongest fact to show that time is not a retailer, despite its ability to say to magazine.com, no, I don't want you hiring people like that, and I want to control the representatives you choose. No, you can't sell except for this length of a subscription, and I don't deliver on this special deal. Tell me why that is not sufficient to show or at least create a dispute of material fact as to who the retailer is. Sure. So there is an overwhelming amount of evidence that makes clear that the third-party seller is the retailer, and that includes the resale agreements between the time and the third party itself, which makes clear that the third-party seller is the retailer and reseller of all magazine subscriptions. Yet we agree that they don't buy the magazines from time and take them. Absolutely. That's not a disputed issue of fact. That's exactly what Judge Stee called a distinction without a difference. But there's other evidence beyond just the label in the reseller agreement. The resellers were responsible for collecting and remitting to the appropriate government agencies all taxes. The third-party seller, so here magazines.com, was the entity that the purchaser paid. The customer that purchased a subscription from a third-party seller could not pay time, and if they wanted a refund, they couldn't get it from time. To the extent the purchaser had a billing issue, they would call the third-party seller. If they called time, time would refer them to the third-party seller. The same goes if the purchaser did not receive a copy of their magazine. The Declaration of Karen Siminoe, and this is in the record at record entry number 143, says that in that case, if the subscriber called time, time would direct them to the third-party agent, the third-party seller. Now, of course, in that case, the third-party seller may then itself go call time and say, hey, our client, our customer, is telling us they didn't get their magazine. What the heck's going on? But that doesn't make time the retailer any more than it makes Toro the retailer when my hardware store calls Toro and says, hey, Jeff didn't get his lawnmower, did you send it? Time is not the retailer. And the third-party seller was required to provide a toll-free customer service number as well. None of these facts are disputed. They were submitted through the resale agreement and the Karen Siminoe Declaration, and none are disputed. Now, Mr. Perlstadt made some characterizations of the resale agreement about allowing an authorization and authorizing particular entities to be the ones to sell at retail, and I think that doesn't render time a retailer or the seller an agent. It's like the lawnmower situation. Any entity that does not itself manufacture or produce something but obtains the right to sell it is going to have to do it by some authorization and provide some consideration to the manufacturing and producing party. That's just the way it works. And I also want to be very clear about the Scott Brininger testimony, which I believe Mr. Perlstadt said is the most important testimony, and he said that Mr. Brininger testified that the third-party sellers are selling magazines for time, and I don't think that's exactly correct. The question that was posed to Mr. Brininger, a lay witness, was, are you talking about the people that sell magazines for you? And he said, correct, referring to these third-party sellers. So a lay witness saying correct to a question which an attorney embedded a legal premise in it is not any sort of admission or it's not evidence, certainly not evidence that countervails the remaining undisputed evidence that these third-party sellers were the entity that had the retail relationship with this class. And I also think it bears noting that, as Judge Schranch, I believe you said, time is a retailer in some instances, and I think that when you look at plaintiff's papers, they agree that that's not enough and that, in this case, there has to be a retail customer relationship between the plaintiff and time. And there is actually, that's the kinder and that's what Judge Dee said, and there is actually a separate class action that these same attorneys filed four days later on behalf of, after Judge Dee granted summary judgment, on behalf of that group that purchased directly from time. But in this case, there is no dispute that these plaintiffs purchased from the third-party sellers. Now, World Book, Mr. Perlstadt talked about World Book, and I think World Book was a very different case. First of all, it involved an entirely different question. The question in World Book was where a particular transaction was consummated for tax purposes. And the court found that that was Illinois, where World Book put out door-to-door salespeople to sell its World Book product. And World Book had to approve individual purchase transactions. Payments were from the purchasers. Purchasers paid World Book. None of that is like the case here. Time didn't send out door-to-door salespeople. Time didn't approve individual sales to customers. And time didn't receive the payment. And I think it's interesting, in the case of Ms. Coulter-Owens particularly, the named plaintiff in this case, she paid $2 for each of her magazine subscriptions to Fortune, Real Simple, and Time. Zero cents of that $2 was even, or $6 total, was even remitted to Time magazine, to Time Inc. Zero. And I don't think it would change the calculus of whether or not Time was a retailer if 50 cents or $1 per subscription were remitted to Time. But I think the fact that in many of these instances, with many members of this class, Time didn't even get any money out of the exchange just further confirms that Time was not the retailer. Now, Mr. Perlstadt talked a lot about how the VRPA or the PPPA is meant to protect the privacy of individuals or privacy of magazine readers. But the PPPA is not meant to encompass every single way a person can come to possess reading information and every single person who comes to possess reading information. It was targeted at a very limited set of circumstances, a retailer-customer relationship. And in 2016, the Michigan Legislature actually amended the PPPA. And in that case, it could have expanded the scope of the statute to cover, for example, any person who comes to possess personal reading information. This was after Judge Stee and Judge Ludington issued their opinions stating that the statute as written only applied to retailer-customer relationships. But the Michigan Legislature didn't change that. They left it as is, ratifying or confirming the common sense reading of the statute, which itself requires and uses the word customer three times in the main provision and retail once, and customer throughout the statute. I guess if we're operating under the earlier version, I think you would have to concede that part of the goal of this act is to enable people to have some relevant relative privacy about their reading material. And in this part of the pleading is that the names of these people were provided to Axiom and Weiland for the purpose of collecting more information. That's the undergirding concern, because it's not only that I've purchased this magazine, but now my name is in a co-op, and the co-op is collecting all this other information about me and my family and then is able to share it with all of everyone else who is a member of the co-op. Isn't that sort of consolidation of private information on individuals the undergirding concern of this act? So the short answer is no, I don't think that's the undergirding concern. I think the undergirding concern of the act was the Judge Bork situation that led to the statute. But I think the important— The Judge Bork situation was videos, wasn't it? You know, that the public has no right to know what he chooses to view. And isn't that much of what undergirds— I don't understand how that cannot be what undergirds this and how the Axiom relationship and the Weiland relationship are exemplary of the problem. Now, it may not be covered. But still, isn't it—I don't understand how you can argue that it's not the issue that undergirds this because it is that dissemination of information that is the concerning factor. So I think that you're not incorrect, but I think that the notion and the impression you're getting about what Axiom does and sort of the nature of the use of Axiom and Weiland is not exactly how the process worked. And Mr. Perlstadt came up here and talked about Axiom being a data miner. And, you know, throughout their papers, they use a lot of, you know, inflammatory— or, you know, they describe it that way. But I think it's very important to understand what, in this case, Axiom does here. Axiom is a database host. And they host Time's consumer marketing data so that when Time wants to market to people and they want to market to people who are a certain age, they can type in a couple of keys— They can market anything, anything that Time owns and has and is available for sale, which is a huge empire of information and products. Time can market to its own customers, for sure. Well, but— Or Time can market— If you're in a co-op, you're sharing customers. I mean, that's the whole goal. So in that—and so the co-op was going to be my next stop on the tour. And so the way the co-op worked is the participants in the co-op would place names—would transfer files to the co-op. So, for example, if Fortune was participating in the co-op, it would just send its list of Fortune subscribers to the co-op. But once in the co-op, the data was completely anonymized. So no one could go—and this is all undisputed in the record through Mr. Brininger's testimony. So it doesn't go to the underlying issue that Judge Steele ruled on, but I think it hopefully assuages some of the concerns. It was anonymized. So no one could say, hey, send me a list of all the people who subscribe to Wyland. All they could do is say, we'd like to get a list of people who subscribe to 10 national magazines who— Who make this amount of money and have children and live in this city or versus the country. All of those kind of identifying factors that are—can be used to particularize the sale of products. So I don't know if in the Wyland co-op that is an option. What I do know is that when time provides information to go into the co-op, and again, let me— If a customer opts out or if a subscriber opts out of disclosures, their name is not provided to Wyland. And if it was provided to Wyland, it gets purged from the Wyland file. But all time does is say, here's a list of subscribers to this magazine. And I do want to take a step back. The VRPA or the PPPA was not meant to be an all-encompassing privacy statute. It was meant to apply to a specific, specific situation. And the reason it was applying to the retailer-customer situation is because it's the retailer who is the person that makes the disclosure in the first instance. And the retailer who is in position to get consent in the first instance. And I think here it's telling that in the Wyland argument, they argue, well, the opt-outs that time gave are ineffective because they didn't get the opt-outs at the time of subscription. But that's the whole point. Time, as Ms. Coulter-Owens conceded, time couldn't have gotten any consent at the time of subscription because they weren't the ones with the retailer relationship with the customer or with the subscriber. And because the VRPA requires that relationship, which plaintiffs don't dispute, and because the undisputed evidence in this case is clear that no such relationship existed between time and this class, Judge Stee's decision should be affirmed. Thank you. Thank you, counsel. Thank you, Your Honors. Just, I think, two quick points I want to make here. First, Judge Stranch raised the concern of the statute or the purpose of the statute. And I think the biggest problem with Time's retailer argument is under their view of retailer, their view that they're not a retailer, they can disclose to anyone. They could disclose, suppose Judge Bork or a future Supreme Court nominee bought a magazine through Magazines.com or another third-party sales agent. Under Time's theory, they say, I'm not a retailer. I can go out and tell the Washington Post. I can tell USA Today. I can tell the news media what Judge Bork or what this judge reads on a daily basis, what magazines he subscribes to, whether he subscribes to People or Sports Illustrated or other kinds of magazines. And so that's what I was trying to get at with the transfer of information point earlier, that time gets the subscriber information automatically. They know this information. And under my friend's theory here, it doesn't matter. It just doesn't matter. Anything else after that doesn't matter. And under either version of the statute, if they're not a retailer, they can disclose this information to anyone. And the second point I'd like to make is just I think my friend's argument basically made our point about the factual dispute. He stands up here and he says, that's not exactly how Axiom works. That's not exactly what Mr. Brininger testified to. That's not exactly how this stuff works. That's all factual dispute. This is a nitty-gritty factual case about what is going on here. And I think unless there's further questions, I think I'll stop. And we would just ask that you reverse the entry of summary judgment in favor of time and remand for further proceedings. Thank you. Case will be submitted. There being nothing.